**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| TAQIUDDAN KHAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | **Case No: 11 C 6122** |
| v. ) | |
| ) | **Magistrate Judge Jeffrey Cole** |
| CAROLYN W. COLVIN,[1] ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Taqiuddan Khan, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2). Mr. Khan asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.
## PROCEDURAL HISTORY

Mr. Khan applied for DIB on June 13, 2007, alleging that he had become disabled on August 15, 2005, due to open heart surgery, severe weakness, panic attacks, memory loss diabetes, hypertension, coronary artery disease, and high cholesterol. (Administrative Record ("R.") 15, 264). Mr. Khan's insured status expired on December 31, 2005 (R. 15, 40), meaning he had to establish he became disabled before that. *Shideler v. Astrue*, 688 F.3d 306, 311 (7th Cir. 2012). His claim was denied initially and

---

[1] Pursuant to Federal Rules of Civil Procedure 25(d), we have substituted Carolyn W. Colvin for Michael J. Astrue as the appellee.

upon reconsideration. (R. 105-111, 119-123).  Mr. Khan continued pursuit of his claim by filing a timely request for hearing.  (R. 112-114).

An administrative law judge ("ALJ") convened a hearing on March 24, 2009, and reconvened it on October 20, 2009, at which Mr. Khan, represented by counsel, appeared and testified. (R. 28-104).  In addition, at the second hearing, Mr. Khan's wife also testified, along with Dr. Ronald Semerdjian and Susan Entenberg, who testified as medical and vocational experts, respectively.  (R. 39).  On February 22, 2010, the ALJ issued a decision finding that Mr. Khan was not disabled because he retained the capacity to perform a significant range of medium work, which allowed him to return to his past relevant work as a bookstore cashier and a medical technologist and to perform other work in the economy.  (R. 12-27).  This became the final decision of the Commissioner when the Appeals Council denied Mr. Khan's request for review of the decision on July 15, 2011.  (R. 1-5).  *See* 20 C.F.R. §§ 404.955; 404.981.  Mr. Khan has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## THE EVIDENCE OF RECORD

### A.
### The Vocational Evidence

Mr. Khan was born on December 3, 1949, making him fifty-six years old at the time his insured status expired.  (R. 260).  From 1975 until 1999, he worked as a medical technician.  (R. 265).  More recently, he was a cashier at a bookstore for three months in 2005.  (R. 265).

**B.**
**The Medical Evidence**

The medical record in this case is a 700-page juggernaut but, judging from Mr.

Khan's brief, very little of it is relevant to his claim. He refers the court to just a few

scant pages of medical evidence. (*Plaintiff's Memorandum*, at 17, 18-19). On August

27, 1997, Mr. Khan went to the emergency room after becoming dizzy and experiencing

palpitations at work. His blood pressure was significantly elevated at 187/97. (R. 761).

While at the hospital, he had arrhythmia and sinus tachycardia. (R. 762). An ECG was

abnormal, revealing a nonspecific T-wave abnormality but no acute ST changes. (R.

758, 778-79). An exercise stress test showed no ischemia. (R. 762). It was said that Mr.

Khan had 5 risk factors for coronary artery disease, among which was a strong family

history wherein his father, brother, and two uncles all died from it between the ages of 50

and 55. (R. 784). He was treated and discharged on aspirin, glyburide, atanolol, and

lisinopril in stable condition. (R. 762). As the Commissioner points out, all of this

evidence dates back to the time during which Mr. Khan was working, about eight years

prior to his alleged onset date.

The rest of the evidence the plaintiff relies on to support his claim dates a year

and a half after the expiration of Mr. Khan's insured status in December 2005. On June

3, 2007, Mr. Khan went to Swedish Covenant Hospital complaining of respiratory

distress. He was treated with Lasix and Albuterol. (R. 598). On June 18th, Mr. Khan's

treating physician, Dr. Abdul Sattar, reported that he had been treating Mr. Khan for

hypertension and diabetes for ten years. He added that Mr. Khan "had severe [coronary

artery disease] and had Triple Vessel By pass." Dr. Sattar also stated that Mr. Khan had memory loss and congestive heart failure. (R. 385).

Also that same month, lab results revealed that Mr. Khan's blood glucose was slightly elevated – 108 when the normal range is 65-99. (R. 398). In July 2007, Dr. Sattar filled out a form and reported that the onset of Mr. Khan's coronary artery disease was April 2007. (R. 402). The first examination showing heart failure was in May of 2007. (R. 402). Mr. Khan exhibited peripheral edema, jugular vein distension, pulmonary edema, dyspnea, and orthopnea. (R. 403). Dr. Sattar rated Mr. Khan's impairment as Class II on the New York Heart Association scale. (R. 403). That signifies a mild impairment, resulting in a "[s]light limitation of physical activity. [The patient is] comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea." http://www.abouthf.org/questions_stages.htm. Dr. Sattar confirmed that Mr. Khan experienced recurrent fatigue, palpitation, and dyspnea. (R. 404). He said that Mr. Khan could walk for no longer than five minutes. He could walk two blocks slowly, but could not climb, push, pull, or bend. (R. 404). Mr. Khan's response to medication was fair. (R. 406). Dr. Sattar also reported that Mr. Khan suffered no complications from his diabetes, which was controlled with Actos. (R. 407).

By October 2007, Dr. Sattar said Mr. Khan had no limitations on his ability to sit, and his ability to stand was reduced by just 10%. His ability to pull, push, and stoop were reduced by 50%, while he had a 25% reduction in bending. (R. 417). Another treating physician – the signature is illegible – said that Mr. Khan had chest discomfort that was precipitated by walking, emotion, physical work, and facing cold air. (R. 423). It radiated to his throat twice a day, and was relieved with rest or a vasodilator. (R. 423).

He suffered fatigue and dyspnea upon physical activity. That doctor restricted him to light exercise. (R. 424). In March of 2009, Dr. Sattar offered yet another opinion. Now he sad Mr. Khan was unable to walk or sit for more than a half-hour total in an eight-hour day. (R. 1006). He was unable to work at all, and the onset of his symptoms was 2002. (R. 1007-08).

**C.**
**The Administrative Hearing Testimony**

**1.**
**The Plaintiff's Testimony**

At the first hearing, the ALJ explained that the record included only evidence from well before the alleged onset of disability and from after the expiration of Mr. Khan's insured status. (R. 31-36). The hearing was set over to a later date so relevant evidence, if any, could be submitted, the date last insured ("DLI") could be verified, and a medical expert could be engaged. (R. 34-36).

When the hearing reconvened about seven months later, Mr. Khan testified that his problems began in August of 2005, when he began feeling dizzy, weak and forgetful. (R. 45). Then he said he began feeling weak in 1997. (R. 45). He explained that he was terminated from two jobs due to his weakness in 2005. (R. 46). He could no longer lift books or boxes that were heavy. (R. 46). He said he got short of breath lifting more than five pounds, walking two blocks, or climbing five stairs. (R. 46).

Mr. Khan was laid off from Michael Reese Hospital during a cut back in 1999 and went on unemployment. (R. 47). He was fired from the bookstore job because, even though he sat for about 6 of 8 hours each day – he worked just 2 days a week – and carried no more than 10 pounds, he could not perform the work. (R. 47-48). He was also

terminated after just 28 days working at Rush Presbyterian, where he was a lab technician. (R. 49-50). Again, he only had to lift about ten pounds in the job and sat nearly all day. (R. 50).

At home, he didn't help his wife with any housework; he spent most of his time reading. (R. 52). Between 1999 and 2005, he did some volunteer work, but most lived "[l]ike a retired life, sick man, sitting most of the time at home, some time reading books, watching TV." (R. 53). Mr. Khan then said he currently spent a lot of time meditating and watching the neighbors, who sometimes caused problems. (R. 54). He said he doesn't walk anywhere but his hallway and does a little bit of stretching for his shoulder. (R. 56). He admitted that his doctors had recommended exercise. (R. 56). They tell him to take walks and exercise every appointment. (R. 57).

## 2.
### The Plaintiff's Wife's Testimony

Mrs. Khan testified that, as best as she could remember, her husband was lethargic, irritable and, forgetful. (R. 74). He had problems doing things and if he lifted anything really heavy he would have to sit down to rest. (R. 75). The time period could have been 2004, 2005, or 2006. (R. 75). His memory has gotten worse and has been very bad since 2005 or 2006. (R. 77).

## 3.
### The Medical Expert's Testimony

Dr. Ronald Semerdjian then testified as a medical expert. He noted there was a significant hiatus in Mr. Khan's medica record from about 2000 to 2007. (R. 79-80). There was nothing in the record from 2005 to April 2007 to demonstrate Mr. Khan's condition. (R. 82). Prior to that, he had a normal stress test, so no diagnosis of a heart

condition was established. (R. 82-83). The only impairments established were hypertension and diabetes. (R. 83). Coronary artery disease was confirmed in April 2007. (R. 84). Mr. Khan had no impairment that met or equaled the listings prior to the expiration of his insured status. (R. 85). Even after December 2005, the medical evidence did not show that he met a listing. (R. 86).

After December 2005, Mr. Khan would have experienced some compromise in his exercise tolerance due to impaired cardiac functioning. (R. 87). He would have no difficulty sitting, but would get short of breath after a sustained period of walking or climbing a flight of stairs. (R. 88). He could lift ten pounds, but carrying it distances might be an issue. (R. 89). He could stand or walking for two hours during a day. (R. 89). The combination of anxiety and his physical condition would have a significant effect on Mr. Khan's ability to sustain focus over an eight-hour period, five days a week. (R. 90). But that would only have begun to occur from April 2007 on. (R. 91).

Prior to December 2005, there was no medical evidence the doctor could use to say Mr. Khan was significantly impaired at that time. (R. 92). Moreover, he could not extrapolate from the later evidence. (R. 92). There was no evidence in the record to support a conclusion that Mr. Khan had been "totally and permanently disabled" since 2002, which is what his treating physician, Dr. Sattar, opined in March of 2009. (R. 94, 1008). Mr. Khan's attorney questioned the ME in an attempt to uncover some evidence that established Mr. Khan was disabled due to coronary artery disease prior to December 2005, and directed the doctor to a stress test performed in 2003. (R. 94). The ME explained to counsel, however, that the stress test was normal. (R. 95).[2]

---

[2] Mr. Khan's attorney apparently never did understand that a normal stress test showing a good
(continued...)

**4.**
**The Vocational Expert's Testimony**

Susan Entenberg then testified as a vocational expert. She classified Mr. Khan's past lab technician work as he performed as skilled and sedentary, although the Dictionary of Occupational Titles listed it as light work. (R. 98). The book store cashier was the same; generally light work, but Mr. Khan's specific position was sedentary. (R. 98). In response to the ALJ's hypotheticals, the VE testified that if a person were limited to medium work that did not require climbing, balancing, stooping, crawling, or kneeling on any more than a frequent basis, he would be capable of performing Mr. Khan's past work. (R. 99). Moreover, there would be 70,000 other types jobs he could perform in the regional economy. (R. 100).

A limitation to light work would also allow for the performance of Mr. Khan's past work. (R. 100). A limitation to sedentary work would allow the performance of the past work only as Mr. Khan actually performed it, not how it is generally performed in the regional economy. (R. 101). If a person could lift no more than ten pounds, sit for no more than a total of two hours, stand an walk for no more than two hours, or was unable to maintain attention for a total of six hours in a day, not surprisingly, there would be no jobs they could perform. (R. 102).

**D.**
**The ALJ's Decision**

---

[2](...continued)
capacity for exercise (R. 1016) was not evidence of disability. In his reply brief , he characterizes the ME's above-cited testimony as conceding that the 2003 test indicated Mr. Khan was suffering cardiac symptomatology at that time. (*Plaintiff's Reply*, at 12). In fact, the ME clearly contradicted this theory, saying "actually it's a normal test in all three [pages]." (R. 95).

The ALJ found that, through the date he was last insured, Mr. Khan suffered from the following severe impairments: hypertension and diabetes mellitus; thereafter, he also suffered from coronary artery disease (onset about April 2007), hypothyroidism (January 2009), and affective and/or anxiety disorder (April 2007). (R. 17). He further found that, prior to the date last insured, these impairments did not meet or equal a listed impairment, specifically listing 4.00 *et seq.*, covering cardiovascular impairments, and 9.08, covering diabetes mellitus. (R. 17).

Next, the ALJ summarized the evidence in the medical record and discussed Mr. Khan's testimony, and determined that he could, essentially, perform medium work. He could lift or carry up to 50 pounds occasionally and 25 pounds frequently, sit, stand, and walk, with for up to 6 hours each in an eight hour day. He could not climb ladders, ropes, or scaffolds and could not climb stairs, balance, stoop, kneel, crouch, or crawl more than frequently, and he had to avoid exposure to unprotected heights and dangerous moving machinery. (R. 18). The ALJ felt that Mr. Khan's impairments could cause some of his alleged symptoms, but not to the degree he alleged and not to a point where it would be inconsistent with a capacity for medium work. (R. 18). Coronary artery disease was not diagnosed until April 2007. Mr. Khan's diabetes was never said to result in any limitations. When he was treated for dizziness, palpitations, and hypertension in 1997, his stress test was normal, his symptoms resolved, and there were no restrictions on his activity. Treatment notes from 1999 were unremarkable aside from a diagnosis of hypertension. There was one incidence of significantly elevated blood sugar in 200, but Mr. Khan was treated and advised to follow a strict diet and exercise program. An ECG in 2001 revealed no abnormality and stress testing in 2003 was

normal. (R. 18). In October 2005 or 2007, cardiac exam was normal. There was no report of symptomatology until April 2007, well after the expiration of Mr. Khan's insured status. It was then that Mr. Khan had by pass surgery. (R. 19). The ALJ noted that the ME testified that disability could not be established prior to December 2005 and that it could not be extrapolated back from April 2007. (R. 21).

The ALJ noted that Dr. Sattar and another source found that Mr. Khan was disabled with the onset of symptoms being after the expiration of Mr. Khan's insured status explained that the opinions that Mr. Khan was disabled as of 1999 was not supported by the record. (R. 20). And the ALJ found the testimony of the ME that there was no evidence to establish disability prior to the expiration of Mr. Khan's insured status. (R. 21).

The ALJ went on to consider the VE's testimony. Crediting it, he found that, through the date last insured, given his residual functional capacity ("RFC"), Mr. Khan could perform his past relevant work as a lab technician or bookstore cashier. (R. 21). He could have ended his analysis there, but he continued and, using the Medical Vocational Guidelines as a framework and, again, crediting the VE's testimony, found that there were other jobs that existed in the regional economy that Mr. Khan could perform. (R. 22). Accordingly, the ALJ found Mr. Khan not disabled and not entitled to DIB under the Act. (R. 23).

**IV.**
**DISCUSSION**

**A.**
**Standard of Review**

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger*, 516 F.3d at 544. Where conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408, (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v.*

*Chater*, 78 F.3d 305, 307 (7ᵗʰ Cir. 1996). It's also called a "lax" standard, *Berger*, 516 F.3d at 544.

## B.
## The Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7ᵗʰ Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7ᵗʰ Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7ᵗʰ Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7ᵗʰ Cir. 1997).

## C.
## Analysis

Mr. Khan first argues that the ALJ erred when he found that Mr. Khan's bookstore job was past relevant work. He also contends that the ALJ was wrong in concluding that he could return to his lab technician job. Mr. Khan also finds fault with the ALJ's RFC finding, saying there is no basis for it, and with his credibility determination. Finally, Mr. Khan doesn't think the ALJ properly evaluated Dr. Sattar's opinion.

## 1.

The ALJ determined that, before his insured status expired, Mr. Khan was capable of performing a slightly limited range of medium work. To reach this conclusion, the ALJ summarized, rather thoroughly, Mr. Khan's medical record in chronological order. (R. 20). Along the way he credited the ME's opinion that there was no medical evidence to demonstrate that Mr. Khan suffered from any significant functional limitation prior to December 31, 2005. (R. 21). In the end, the ALJ explained that his "residual functional capacity [assessment] is supported by the overall medical record." (R. 21). Really, when one looks at the record, which is silent for several years prior to Mr. Khan's date last insured, the ALJ was, arguably, giving Mr. Khan the benefit of the doubt by determining he had any restrictions at all.

Mr. Khan, however, begs to differ. He argues that the ALJ did not explain how he arrived at his conclusion. Citing *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011), he contends that the ALJ had to "articulate the basis for specific physical restrictions, such as the amount of weight a claimant can lift/carry." (*Plaintiff's Memorandum*, at 14). It's not clear why the ALJ stating his reliance and the ME and the overall medical record does not satisfy Mr. Khan. "The ALJ's job was to assess [Mr. Khan's] residual

functional capacity by evaluating the 'objective medical evidence and other evidence' to determine whether it was consistent with [Mr. Khan's] subjective statements regarding his impairment." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). That's just what the ALJ did here; there was *no* medical evidence to establish a functional limitation.

Perhaps the ALJ was giving Mr. Khan, who at 56 by his date last insured was of "advanced age" under the under the regulations, 20 C.F.R. §404.1563, the benefit of the doubt by not finding his capacity to work unlimited. It is true that the ALJ must provide a "logical bridge" between the evidence and his conclusion, but the fact that he failed to cite a piece of evidence that showed Mr. Khan could only lift 50 pounds instead of 100 cannot, commonsensically, mean that this case must be remanded. If the ALJ fell short in his logical bridge obligations, given the record, it was an error that favored Mr. Khan as opposed to one that worked against him. *See Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010)(no error where ALJ limited claimant to a more restrictive residual functional capacity finding than any physician on the record). Requiring anything more from an ALJ where the medical evidence fails to establish any restriction prior to the date last insured and the ME opines that there is no evidence to establish any significant functional limitation would be tantamount to requiring a perfect decision. But these decisions do not have to be perfect. *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). The ALJ need only "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability." *Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir.2004). He did that here.

But, Mr. Khan likens this case to *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011). There, the Seventh Circuit found a remand was required because the ALJ did not

identify any medical evidence to substantiate her belief that the claimant could meet the physical demands of light work. In that case, however, the ALJ cited to a piece of evidence that did not support her conclusion. Here, the ALJ relied on the overall record and the ME's testimony. Even Mr. Khan tacitly concedes that the medical evidence does not support his claim for disability by arguing that the only evidence to do so is his own testimony. (*Plaintiff's Reply*, at 8 ("Plaintiff's testimony as to his limitations prior to the date last insured *is* sufficient to meet his burden . . . .")). The ALJ, however, didn't fully believe that testimony, and that provides a good segue to Mr. Khan's argument that the ALJ didn't properly assess his credibility.

## 2.

An ALJ's RFC determination need only incorporate those limitations he accepts as credible. *Seamon v. Astrue*, 364 Fed.Appx. 243, 248, 2010 WL 323515, 4 (7th Cir. 2010); *Schmidt v. Astrue,* 496 F.3d 833, 846 (7th Cir.2007). The ALJ's credibility determination is entitled special deference and will only be overturned if it is "patently wrong." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). "Reviewing courts therefore should rarely disturb an ALJ's credibility determination, unless that finding is unreasonable or unsupported." *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). Here, Mr. Khan contends that the ALJ's credibility assessment was improper because the ALJ employed boilerplate language and failed to explain why he felt Mr. Khan's allegations about his forgetfulness, weakness, and inability to walk long distances, lift much, or stand for long periods were not credible.

The "boilerplate" argument is readily disposed of. It is true that the ALJ employed the "horrific" sentence that the Seventh Circuit has decried since *Bjornson v.*

*Astrue*, 671 F.3d 640 (7th Cir. 2012): "After careful consideration of the evidence, the undersigned [administrative law judge] finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." 671 F.3d at 644-45; (R. 19).

But this is only the beginning of the analysis. Time and again the Seventh Circuit has held that the inclusion of the boilerplate RFC/credibility language – which ALJs obdurately insist on continuing to use despite the Seventh Circuit's rejection – isn't toxic, contaminating irretrievably every opinion in which it appears.[3] The question is whether an opinion containing the offending language also contains an otherwise sustainable explanation for his credibility assessment. "If the ALJ has otherwise explained his

---

[3] The Seventh Circuit has chided ALJs for using this and other boilerplate in their opinions because it puts the cart before the horse. And it does. But, a credibility determination and an RFC finding often go hand-in-hand. After all, the main question in these cases will always be how much can the claimant do? In cases where benefits are denied, almost invariably the claimant will say he can't do much at all, but the ALJ will find that the medical evidence says otherwise. An ALJ cannot and should not ignore the medical record when assessing a claimant's credibility, as the Seventh Circuit has said time and again. *See, e.g., Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013). What if his demeanor is sanguine and he's a believable witness when he says he can't make a fist. Is the ALJ forced to find him credible a step before looking at medical evidence filled with normal grip strength testing results? Evidence that suggests that he can do all the gripping and lifting he likes? Of course not. Looking at testimony against the backdrop of other evidence is neither novel nor exclusive to Social Security cases. *See Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 573-75 (1985)(". . . factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story . . . ");*United States v. Fox*, 548 F.3d 523, 529 (7th Cir. 2008).

The forbidden boilerplate is sometimes a shorthanded means of expressing this, albeit perhaps an awkward one, and, of course, a prohibited one because standing alone it puts the cart before the horse. Say that medical evidence suggests a claimant can lift twenty pounds. Perhaps his own treating physician or a consultative doctor opines that he has no medical condition that would prevent him from doing so. Yet the claimant says he can't even lift ten pounds. An ALJ could find that the claimant has an RFC that allows him to lift twenty pounds and that, at the same time – logically –  his allegation that he can't lift ten pounds is not credible.

conclusion adequately, the inclusion of this language can be harmless." *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir 2012); *see also. Pepper v. Colvin*, 712 F.3d 351, 368 (7th Cir. 2013); *Shideler v. Astrue*, 688 F.3d 306, 312 (7th Cir. 2012). Here, all Mr. Khan had to do was read the next paragraph in the ALJ's decision to see that the ALJ offered a valid rationale for disbelieving Mr. Khan: he found that Mr. Khan's allegations were not entirely credible because the medical record did not reveal or suggest the nature of the symptoms nor the degree of limitation Mr. Khan reported. (R. 19). As such, the boilerplate argument has no place in this case.[4]

"[D]iscrepancies between the objective evidence and self-reports may suggest symptom exaggeration." *Getch,* 539 F.3d at 483; *Jones v. Astrue*, 623 F.3d 1155, 1161 (7th Cir. 2010); *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011). There were certainly "discrepancies" here, at the very least. As the ALJ made clear, for several years before the alleged onset and for at least a year and a half after the expiration of Mr. Khan's insured status, there was no medical evidence to suggest he had any restrictions on his capacity for work. Mr. Khan complains that the ALJ failed to build a "logical bridge" from the evidence to his conclusion that Mr. Khan was not credible. But it is unclear what more Mr. Khan needs. It's not much of a leap from the lack of medical

---

[4] This is not first time Mr. Khan's attorney has wedged the boilerplate argument in where it is wrong because it ignores the additional explanation given elsewhere in the opinion by the ALJ. But that simply makes the argument, itself, boilerplate and doomed to rejection. *See, e.g., Orienti v. Astrue*, 2013 WL 4008719, *12-13 (N.D.Ill. 2013); *Patton v. Colvin*, 2013 WL 4024506, *3 n.3 (N.D.Ill. 2013). The emerging pattern is disturbing. Counsel is reminded that an attorney violates Rule 11 when he or she presents an argument in a brief that has no reasonable basis in law or fact. Fed.R.Civ.P. 11(b); *Fabriko Acquisition Corp. v. Prokos,* 536 F.3d 605, 610 (7th Cir.2008). When an ALJ provides reasons for disbelieving a claimants testimony, plaintiff's counsel may argue that those reasons are invalid, but the kind of "boilerplate argument" advanced here has no basis in fact or law.

evidence to disbelief of his allegations. The cases merely require a bridge, not a hand-held escort across it as well.

The situation can be likened to that in *Jones*, only the record here offers even less support for Mr. Khan's allegations. In *Jones*, the Seventh Circuit allowed a credibility determination to stand where the objective medical evidence consistently revealed only mild degenerative change, and the ALJ properly relied upon the discrepancy between the objective evidence and Jones's self-reports. 623 F.3d at 1161. The relevant evidence in this record reveals less than that. The ALJ's credibility assessment here certainly merits the same deference granted the one in *Jones*.

**3.**

Mr. Khan complains that the ALJ improperly favored the ME's opinion over that of his treating physician, Dr. Sattar, and failed to explain why. He adds that the ALJ also failed to address the medical evidence supporting Dr. Sattar's opinion, including "several abnormal EKGs." (*Plaintiff's Memorandum*, at 19). But Mr. Khan's argument reveals a careless reading of the ALJ's opinion and a mischaracterization of the evidence.

"An ALJ who does not give controlling weight to the opinion of the claimant's treating physician must offer 'good reasons' for declining to do so." *Larson v. Astrue,* 615 F.3d 744, 749 (7ᵗʰ Cir.2010). Contrary to Mr. Khan's reading of the ALJ's opinion, that's just what the ALJ did here:

> In a report of March 23, 2009, Dr. Sattar noted the presence of previously unidentified and unexplained deficits in memory, the presence of anxiety and depression. Based upon existing impairments he opined, in summary, that [Mr. Khan] was unable to sustain work activity for 6 to 8 hours per

day, and that [he] had been so limited since 2002. The latter conclusion with treatment records and previous reports provided by the doctor, and is inconsistent with the medical record, particularly for the period on and preceding December 31, 2005.

(R. 20). It is entirely appropriate for an ALJ to reject the opinion of a treating physician when it is inconsistent with his own notes or with the record as a whole. *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir.2010); *Ketelboeter v. Astrue,* 550 F.3d 620, 625 (7th Cir.2008); *Schmidt v. Astrue,* 496 F.3d 833, 842 (7th Cir.2007); *White v. Barnhart,* 415 F.3d 654, 659 (7th Cir.2005).

Prior to his assessment of Dr. Sattar's opinion, the ALJ offered a summary of the medical evidence and, as Mr. Khan does not dispute, there is no medical evidence from the relevant period to demonstrate that he is disabled. Mr. Khan cited to what he calls several abnormal ECGs, but his references are all to a study performed on August 28, 1997. (*Plaintiff's Memorandum*, at 19, citing R. 758, 762, 779). So there was *one* abnormal ECG, not "several", revealing non-specific T wave abnormality, and that was eight years before Mr. Khan's alleged onset date. It was followed up with a normal exercise stress test. (R. 762). Mr. Khan was treated, stabilized, and returned to work for at least two more years. As the ALJ pointed out, Mr. Khan also had a another normal exercise stress test in June of 2003. (R. 19, 1013).

Moreover, on the one hand, Dr. Sattar reports that the onset of Mr. Khan's symptoms was April 2007[5] – well after the expiration of his insured status – and on the

---

[5] In his reply brief, Mr. Khan attributes this finding – that Mr. Khan's symptoms did not manifest until April 2007 – to the ALJ (*Plaintiff's Reply*, at 11), or another physician, when it is obvious from the record that it was Mr. Khan's own treating physician who provided that estimation. (R. 402). Compare the signature at page 406 – Dr. Sattar's report in which he says symptoms began April 1, 2007 – with that at page 1008 – where he says symptoms began in 2002. The fact that Mr. Khan is

(continued...)

other he says Mr. Khan has been disabled since 2002. Impairments such as memory loss suddenly appear in his assessment after there had been no mention of them throughout Mr. Khan's treatment. That makes his opinion both inconsistent and unsupported by his treatment notes. Although the ALJ was not so harsh in his critique, Dr. Sattar's opinions certainly smack of a physician "leaning over backwards to support [an] application for benefits" *Scheck v. Barnhart*, 357 F.3d 697, 702 (7th Cir. 2004), or a doctor doing a favor for a friend. *Schmid*t, 496 F.3d at 842; *Hofslien v. Barnhart,* 439 F.3d 375, 377 (7th Cir.2006). The ALJ was well within his rights to reject them.

## 4.

Mr. Khan's two remaining arguments require little attention because, even if they held water, they would not warrant a remand. He contends that the ALJ should not have found him capable of returning to his job as a lab technician because it was not past relevant work under the regulations, but an unsuccessful work attempt. This may or may not be the case, but it is no matter because the ALJ continued on in his analysis and found Mr. Khan capable of performing other jobs that exist in significant numbers in the economy. So, if the ALJ made a mistake, it was a harmless error. *See Guranovich v. Astrue*, 465 Fed.Appx. 541, 543, 2012 WL 453913, 3 (7th Cir. 2012)(harmless error where ALJ made alternate finding).

Finally, Mr. Khan complains that the ALJ did not analyze the onset of his disability according to the guidelines set out in Social Security Ruling 83-20. It's a

---

[5](...continued)

able to find two other reports from another physician – Dr. Sheikh (*Plaintiff's Reply,* at 13) – who also finds that Mr. Khan's symptoms did not begin until April of 2007 (R. 422, 426; 360, 364), does nothing to support his claim that he became disabled prior to December 2005. It's just one more physician who treated Mr. Khan saying that claim is not supported by medical evidence. Along with the ME, and Dr Sattar – in his first opinion – that's quite a roster.

similar argument to the one advanced and rejected in *Eichstadt v. Astrue*, 534 F.3d 663 (7th Cir. 2008). There, the Seventh Circuit explained that the ALJ need not have followed the SSR 83-20 guidelines because he found the claimant not disabled at any point before the expiration of her insured status. "With no finding of disability, there was no need to determine an onset date." 534 F.3d at 667.

Mr. Khan contends that the ALJ *did* make a finding of disability, even thought it appears nowhere in the ALJ's decision. For Mr. Khan, the fact that the ALJ accepted the ME's testimony that Mr. Khan was not disabled prior to December 31, 2005, meant that the ALJ was also adopting his testimony that Mr. Khan probably would have become disabled some time afterward. (*Plaintiff's Reply*, at 6). For this theory he relies on a district court case from 1996. The opinion came down years before *Eichstadt*, however. The fact remains, the ALJ made no finding of disability here, so, under *Eichstadt*, SSR 83-20 does not apply.

In the end, the argument is a rather curious one as it would still not get Mr. Khan any closer to his desired result. SSR 83-20 counsels ALJs as follows:

> How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. *At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.*

534 F.3d at 666 (citing SSR 83-20, emphasis in original). The ALJ did have a medical advisor at the hearing and that advisor explained that Mr. Khan was not disabled prior to the expiration of his insured status. Two of Mr. Khan's doctors said the same thing, with one later contradicting himself. If the ALJ had made a formal finding of disability, the evidence pertaining to onset points to the same conclusion for Mr. Khan: he hasn't

proven he's entitled to benefits. "It would serve no purpose to remand this case to the ALJ for a statement of the obvious." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011).[6]

## CONCLUSION

In this case, it was incumbent upon Mr. Khan to come forward with evidence to demonstrate that he was disabled prior to the expiration of his insured status. *Shideler*, 688 F.3d at 311. Because Mr. Khan was represented by counsel, he is presumed to have made his best case for benefits. *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). That involved the citation of just a few pages of medical evidence; evidence that was either from while he was still working and long before his alleged onset date or from after his insured status expired. Even Mr. Khan suspected that wasn't going to cut it as he fell back to reliance on his allegations. His other fallback position – mischaracterization of the record as described herein (the examples are not exhaustive) – was an inappropriate one. In short, the ALJ's conclusion was based on substantial evidence in the record, including more than one medical opinion. He traced his reasoning in such a manner that even those who have difficulty crossing water hazards should be able to navigate from one end of the bridge to the other. The decision must be affirmed.

---

[6] It must be stressed that this is not an instance where harmless error is invoked based on evidence the ALJ ignored – a misapplication of the doctrine that the Seventh Circuit has often criticized in no uncertain terms. *See Martinez v. Astrue*, 630 F.3d 693, 694 (7th Cir. 2011). This is evidence the ALJ discussed in his opinion.

The plaintiff's motion for summary judgment or remand [Dkt. #15] is DENIED, and the Commissioner's decision is AFFIRMED.

**ENTERED:** _____
**UNITED STATES MAGISTRATE JUDGE**

**DATE:** 10/18/13